**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
<u>**SOUTHERN DIVISION**</u>

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **2:19-cr-00467-ACA-JHE** |
| | ) | |
| **ARKEUNTREZ WASHINGTON** | ) | |

<u>**UNITED STATES' RESPONSE IN OPPOSITION TO**</u>
<u>**DEFENDANT'S MOTION TO SUPPRESS**</u>

The United States opposes the defendant's motion to suppress his statements to law enforcement (Doc. 31). The defendant argues that law enforcement interviewed him at his residence without *Miranda*[1] warnings and that "each statement from the defendant while in custody, without *Miranda* is a violation of his fifth amendment right and each statement must be suppressed." Because the then-23 year old defendant, a former infantryman in the U.S. Army, was not in custody, no *Miranda* warnings were required and the Court should therefore deny the defendant's motion.

## BACKGROUND

Federal law enforcement authorities began investigating the defendant for possible firearms trafficking in July 2019, after noting his repeated purchases in sales reports. The defendant is known to have purchased 15 pistols, including assault

---

[1] *Miranda v. Arizona*, 384 U.S. 486 (1966).

1

rifle-type pistols, in the seven months between November 2018 and July 2019, including five on one day, and three shotguns during a 20 day period in June 2016. After serving a search warrant, law enforcement later learned that the defendant had written at least one letter to imprisoned attempted 9/11 hijacker Zacharias Moussouai. The defendant also had pieces of paper with hand-written instructions on how to build a pen bomb, and another containing the handwritten names of Anwar Awlaki and Abu Bashir, both members of or affiliated with al Qaeda in the Arabian Peninsula, a designated foreign terrorist organization.

### The Defendant Buys Multiple Guns, Triggering an Investigation

In early July 2019, an ATF Agent reviewed recent "Firearms Multiple Sales" reports associated with Mr. Washington ("Washington" or "the defendant"). A Multiple Sales report is generated if a person purchases two or more firearms from a Federal Firearms Licensee ("FFL") within a five-day period. The reports stated that WASHINGTON purchased multiple firearms between June 20, 2019, and July 3, 2019, at Hoover Tactical Firearms, an FFL in Birmingham, Alabama.

According to the reports, on June 20, 2019, WASHINGTON purchased three firearms:

- an American Tactical Inc. ("ATI") Omni Hybrid Maxx, 5.56 caliber, AR-style pistol[2] (S/N NS207521);

- an ATI Omni Hybrid Maxx, 5.56 caliber, AR-style pistol (S/N NS207271); and

- an ATI Omni Hybrid Maxx, 5.56 caliber, AR-style pistol (S/N NS207630).

Also according to the reports, on July 3, 2019, WASHINGTON purchased five firearms, during which he was accompanied by at least one other person:

- an ATI Omni Hybrid Maxx, 5.56 caliber, AR-style pistol (S/N NS207306);

- an ATI Omni Hybrid Maxx, 5.56 caliber, AR-style pistol (S/N NS207304);

- an ATI Omni Hybrid Maxx, .300 blackout caliber, AR-style pistol (S/N NS208519);

- an ATI Omni Hybrid Maxx, .300 caliber, AR-style pistol (S/N NS208724); and

---

[2] An AR-style pistol is a smaller variation of what some refer to as an "assault rifle," which is shorter than an AR-style rifle, but can fires the same caliber bullets, e.g., 5.56 or .300, and uses the same magazines, whether 10, 20 or 30 round capacities. The Dayton, OH gunman who killed nine and wounded 27 in August 2019, used an AR-style pistol.

- a Phoenix Arms Co. HP25A, .25 caliber, semi-automatic pistol (S/N 4548397).

Inexpensive, non-collectible firearms like these are popular in criminal activities and are often seized in criminal investigations. Additionally, firearms traffickers routinely purchase multiple firearms that are of the same make and model, as did the defendant.

On July 11, 2019, Agents obtained surveillance footage and ATF Form 4473 Firearms Transaction Records ("FTRs") from Hoover Tactical Firearms. In accordance with FFL rules and federal law, the FTRs were completed by the defendant at Hoover Tactical Firearms. ATF also learned that Washington used the Hoover Tactical to complete online firearms purchases from a company called "Prepper Gun Shop." (In order to purchase a firearm online, a purchaser must submit an FTR to a local federally licensed firearms dealer, and the local dealer must handle the physical transfer of the firearm to the purchaser.) Agents also identified two additional purchases by WASHINGTON, on May 24, 2019, and June 14, 2019:

- an ATI Omni Hybrid Maxx, 5.56 caliber, AR-style pistol (S/N NS207639); and

- an ATI Omni Hybrid Maxx, 5.56 caliber, AR-style pistol (S/N NS207647).

Further investigation revealed that the defendant also purchased firearms from other FFLs in the Birmingham area.  Between November 21, 2018, and June 8, 2019, he purchased the following firearms from Academy Sports and Outdoors stores in Birmingham and Hoover, Alabama:

- a Taurus G2C, 9mm pistol (S/N TLX48532);

- a Taurus G2C, 9mm pistol (S/N TMB41656);

- a Taurus G2C, 9mm pistol (S/N TLY96006);

- a Taurus G2C, 9mm pistol (S/N TMR70339); and

- a Taurus G2C, 9mm pistol (S/N TMD66488).

And on March 7, 2019, WASHINGTON purchased from Birmingham Pistol Parlor, an FFL in Tarrant, Alabama, the following firearm:

- a Taurus G2C, 9mm pistol (S/N TLX56520).

Between June 3, 2016, and June 23, 2016, WASHINGTON purchased the following firearms from Academy Sports and Outdoors in Hoover, Alabama:

- a Savage Steven Arms ("SSA") Sun City Machinery Model 320, 12 gauge shotgun (S/N 167108A);

- a Savage Steven Arms ("SSA") Sun City Machinery Model 320, 12 gauge shotgun (S/N 168793A); and

- a Savage Steven Arms ("SSA") Sun City Machinery Model 320, 12 gauge shotgun (S/N 169234A).

On or about September 26, 2016, a person sold the SSA Sun City Machinery Model 320, 12 gauge shotgun (S/N 168793A) to Birmingham FFL Golden Pawn and Jewelry. This sale occurred approximately three months after the defendant purchased the firearm.

As detailed above, the defendant purchased at least six 9mm pistols and at least nine AR-style pistols in the Birmingham area between November 21, 2018, and July 3, 2019. According to the defendant, the AR pistols were purchased for approximately $369 each. Agents later discovered that he advertised at least two AR-style pistols for $500 each on Armslist.com ("Armslist"), an online marketplace for firearms.

### Interviews of Defendant[3]

On July 11, 2019, ATF agents tried to interview the defendant about his purchases, in order to verify that he still possessed the firearms and was not trafficking or dealing in them without a license. Agents first went to 5060 Whatley Street, Birmingham, Alabama 35288 (the "Whatley Street residence"), the address listed by the defendant on the FTRs. (Under FFL rules, a firearms purchaser must complete Section A of the FTR, which requires the purchaser's address, and the FFL must confirm with the purchaser that the purchaser's address is current.)

---

[3] There are several hours of interviews. The summaries provided in this pleading are not an attempt to fully capture all contents of the recordings, which have been made available to defense counsel.

Agents found, however, that the defendant did not live at the Whatley Street residence,[4] learning instead that he resided with his grandmother at 928 4th Court West, Birmingham, Alabama 35204 (the "4th Court West residence").

<u>Defendant Interviewed at his Residence – July 11, 2019</u>

On July 11, 2019, ATF agents interviewed Washington at the 4th Court West residence. This and all interviews occurred in the daytime; the Agents were not in uniform; never drew their weapons; never restrained the defendant; did not pat the defendant down and never told him where to sit or remain within his residence. After arriving, Agents spoke with the defendant's grandmother at first, who went to get the defendant. Agents remained on the front porch of the house until the defendant came to the door. After some initial discussion, the defendant invited the Agents to come inside and asked them if they wanted to sit at a table.

Agents explained generally multiple sales reports and their investigation, asking if they could verify firearm serial numbers. The defendant offered to get the firearms he had at the residence so that agents could inspect them, and one Agent asked if he could accompany the defendant to retrieve them, to which the defendant agreed.

---

[4] The defendant's relative lives at the Whatley Street residence. Washington later told ATF agents that the residence was an old address.

The agents asked the defendant about his recent firearms purchases, and asked him to verify the serial numbers related to those purchases. He offered to allow the agents to inspect the firearms, and produced four firearms: two ATI Omni Hybrid, .300 blackout caliber, AR-style pistols; an ATI Omni Hybrid, 5.56 caliber, AR-style pistol; and a Phoenix Arms HP25A, .25 caliber, semi-automatic pistol. The firearms appeared to be in their original packaging.

The defendant said that he had applied for an FFL[5] and was purchasing firearms to start a firearms training business. He stated that he wanted to use his military background to teach civilians about firearms shooting and safety. He also said that he did not purchase the firearms to resell them.

The defendant was asked about the remaining firearms listed on the Multiple Sales reports, and the defendant claimed that those firearms were stored with his aunt, B.W., at her residence at 4602 Brookshire Loop, Bessemer, Alabama 35022 (the "Brookshire residence"). The defendant added that the Brookshire residence was the location he provided on his FFL application.

The defendant agreed to go with the agents to the Brookshire residence. He was not placed in restraints or otherwise put in custody when he rode with Agents

_____

[5] ATF later confirmed that the defendant had a pending FFL application that was in the background check stage. The application was received by ATF on or about June 27, 2019.

to the Brookshire residence. When the agents and Washington arrived, however, no one was home, and Washington did not have access to the residence. Washington provided the agents with B.W.'s telephone number, so they could arrange to inspect the firearms at a later date. He also provided his personal cell phone number, which was the same number Hoover Tactical Firearms provided for the defendant.

After concluding their interaction with the defendant, Agents left. The interaction was cooperative, the defendant was not ordered to do anything, he was not restrained, and law enforcement did not brandish weapons.

On July 17, 2019, Agents contacted B.W., who stated that the firearms at the Brookshire residence belonged to the defendant. B.W. allowed ATF to inspect the guns located there, none of which were listed in the Multiple Sales reports or the other records in ATF's possession. These firearms were:

- a Taurus PT111, 9mm pistol (S/N TLX48532);

- a Smith & Wesson M&P 15, 5.56 caliber rifle (S/N TH06132); and

- a Morrissey Inc. AAM-47, 7.62 caliber, AK-style rifle (S/N AA3-000351).

On July 17, 2019, an ATF agent searched for Washington's cell phone number on the Internet and found that it was listed as the contact number for two advertisements on Armslist. The advertisements were posted on June 24, 2019, and July 6, 2019, and listed for sale two ATI Omni Hybrid Maxx, AR-style pistols, in

5.56 caliber and .300 blackout caliber, respectively. According to the Multiple Sales reports, WASHINGTON purchased these firearms on June 20, 2019, and July 3, 2019. The Armslist posts contained images of the firearms in what appeared to be their original packaging. The firearms and packaging appeared to be identical to the ATI Omni Hybrid Maxx, AR-style pistols and boxes that Washington showed ATF on July 12, 2019.

### ATF Interviews Defendant at his Residence a Second Time – July 19, 2019

The defendant was interviewed a second time, on July 19, at the 4th Court West residence. Agents again visited with the defendant's grandmother first, and then the defendant. Washington stated that he had traded two Taurus G2C pistols (for which he confirmed the serial numbers) for a green 1993 Honda Accord. He stated that he had traded the firearms for the vehicle through a vehicle-sale advertisement on Craigslist.com ("Craigslist"). The defendant could not provide a bill of sale, nor the name or telephone number of the person who received the firearms. He stated that the vehicle later broke down, and that he had sold it for $150 to "Pull-A-Part," a local automotive scrap yard.[6]

---

[6] According to Pull-A-Part, the vehicle was sold to them on May 22, 2019. But according to firearms records, Washington purchased the two Taurus G2C pistols on June 8, 2019. Thus, the trade of the pistols for the vehicle was not possible because the defendant sold the vehicle before he obtained the firearms.

The defendant also said that his remaining firearms were still at the Brookshire residence, and provided contact information for his relatives, J.W. and M.W., so that ATF could verify that he still possessed the firearms.[7]

After concluding their interaction with the defendant, Agents left. The interaction was cooperative, the defendant was not ordered to do anything, he was not restrained, and law enforcement did not brandish weapons.

<u>Defendant is Interviewed at his Residence a Third Time – July 24, 2019</u>

Agents went to the 4th Court West residence again on July 24, in the early afternoon. An Agent was allowed to knock on the defendant's bedroom door to wake him, telling him through the door that the Agent needed to talk with him. (Though the time was between Noon and 1PM, the defendant was asleep). The Agent knocked twice within approximately two minutes, for seconds at a time. Agents told the defendant that they had learned the truth regarding the car story and that they had confirmed the absence of guns at his Aunt's house. As before, the defendant was not restrained, he had not been told where to sit, and had not been told that he had to speak to Agents. Agents told the defendant that it was a crime to lie to federal officers and that what he had told them previously did not make sense, and that now was the time for him to tell them what had happened to the guns.

---

[7] J.W. later reported that the firearms ATF observed on July 17, 2019, were the only firearms at the Brookshire residence. J.W. could not say where the remaining firearms were located.

Agents told Washington that they wanted to discuss the location of the remaining firearms listed in the Multiple Sales reports, and that they were aware of at least 15 firearms the defendant had purchased since 2019; that Agents had identified Armslist advertisements listing his cell phone number under the seller's contact information; and that he could not have traded the Taurus G2C pistols for the 1993 Honda Accord. The defendant was asked if he could produce the firearms for verification purposes.

Eventually, the defendant asked to speak with one of the Agents outside of his home and they moved to the front porch, where the interview continued. At this point, the defendant became emotional, and began shaking and crying. Among other things, he said that he had sold guns to people in other Countries and in other U.S. States, sometimes using a "go-phone" which is often used in illicit activities in order to thwart law enforcement.

The defendant stated that he had discarded the Go-phone in a dumpster in the Loveman's Village Public Housing complex in Birmingham on July 19, 2019, after ATF agents spoke with him. WASHINGTON later led the agents to the dumpster, which was empty. While with the Agents, he was not placed in restraints and was not in custody. He also said that he had shredded his mail and parcel receipts, firearms purchase and sale documentation, and other records after ATF contacted him on July 19, 2019.

The defendant provided the agents with written consent to search the cell phones on his person, a LG ZTE cell phone (IMEI 352439100812928) and an Apple iPhone (MEID 355825084326587). The consent form signed by the defendant, and dated July 24, 2019, stated:

> I understand that I have a right to refuse to give my consent to a search and may demand that a search warrant be obtained prior to any search of the person or property described below.
>
> I understand that any contraband or evidence of a crime found during the search can be seized and used against me m any court of law or other proceeding.
>
> I understand that I may consult with an attorney before or during the search.
>
> I understand that I may withdraw my consent to this search at any time prior to the search's termination.
>
> This consent to search has been given voluntarily without promises, threats, coercion or force of any kind whatsoever.
>
> I have read the above statement of rights, understand these rights, and hereby authorize agents of the Bureau of Alcohol. Tobacco, Firearms and Explosives to conduct a complete search of the property described below.

The phones contained:

- images of AR-style pistols in brown cardboard boxes, similar to the packaging ATF saw at the 4th Court West residence and on Armslist;

- images of mail and parcel packages addressed to WASHINGTON;

- messages where WASHINGTON solicited to sell firearms, including the name, images, and prices of firearms he had for sale;

- screen shots of news articles pertaining to arrests of firearms traffickers; and

- images of Glock full-auto switches (which convert a semiautomatic handgun into a fully automatic one).

After concluding their interaction with the defendant, Agents left. The interaction was cooperative, the defendant was not ordered to do anything, he was not restrained, and law enforcement did not brandish weapons.

**<u>Search Warrant Served at Defendant's Residence – July 26, 2019</u>**

On July 24, 2019, the Honorable John E. Ott, Chief United States Magistrate Judge for the Northern District of Alabama, authorized a search warrant for the 4th Court West residence ("the Home Warrant"). Mag. No. 19-285. On July 26, 2019, ATF agents executed the Home Warrant and discovered the following firearms:

- a Radical Firearms LLC, Model RF-15, AR-style rifle (S/N RD16193);

- a Taurus, Model PT111, 9mm pistol (S/N TJM5586); and

- an IWI-Walther, .22 LR, Uzi-style pistol (S/N W1007266).

Agents also recovered several firearm boxes that are consistent with the firearms ATF believes WASHINGTON bought and sold, as well as receipts and invoices for

firearms, evidence of "go-phone" purchases, documents regarding firearms statutes, various items of digital storage media, and other things.

ATF also found two envelopes addressed to Zacarias Moussaoui at a Federal Bureau of Prisons facility. The envelopes were dated February 2, 2019, and March 1, 2019, and had been returned undelivered to the defendant. The March 1 envelope contained a handwritten letter by Washington, and a statement from BOP explaining that his letter had not been delivered to Moussaoui because he was not on the approved correspondence list.[8]

According to open source reporting, Zacarias Moussaoui was a member of al Qaeda and part of the conspiracy to commit the terrorist attacks against the United States on September 11, 2001. Specifically, Moussaoui was trained as a terrorist in al Qaeda camps in Afghanistan and was sent to the United States to take flight training after another al Qaeda terrorist was unable to obtain a visa to enter the United States. After arriving in the United States in 2001, Moussaoui engaged in flight training, as well as martial arts and physical training, in preparation to hijack an aircraft to use in a terrorist attack. Moussaoui also purchased items (including aviation and navigation equipment and weapons) to use in such an attack, and inquired about crop dusting aircraft and the aerial dispersal of chemicals. In April

---

[8] The envelopes and letter were introduced as Government's Exhibits 1-3 at the defendant's detention hearing. Case No. 2:19-cr-467 at Doc. 5.

2006, Moussaoui pled guilty to six terrorism-related crimes and received a life sentence for each. Because of his connections to violence and the September 11 terrorist attacks, Moussaoui is a revered figure in the radical Islamic community. He has also indicated his desire to advocate terrorism and to contact other terrorists.

In the letter, the defendant introduced himself and said that he was contacting Moussaoui because, while he had "watched documentaries and read" about Moussaoui, he could not "go by what others say." He asked Moussaoui about his place of birth, education, and upbringing, and wrote about his own experiences in Paris and Strasbourg. The defendant then stated:

> Where [sic] you able to learn a lot from our Muslim Brothers?
>
> I read you attend flight training courses at Airman Flight School in Norman, Oklahoma in February 26 to May 29, 2001. Is it hard to get your pilots licenses or fly a plan [sic]?
>
> Because I've bought some plane simulators and I fly drones[.] I just started last summer in 2018 I had bought my first drone which is fun to fly especially FPV – (First Person View).

The letter then asked Moussaoui about his family, and said that he hoped to hear from Moussaoui soon.

ATF also found notebooks and journal entries, which contained handwritten instructions on how to construct several illegal explosive devices and bombs.[9] One set of instructions detailed how to create a "pen bomb" using a pen, flash powder, and a fuse. Another set of instructions described how to create a "works bomb," also known as a "Drano bomb," using drain cleaner, aluminum foil, and a bottle. At the bottom of the instructions was the note "make foil pieces big for big impact" and three names: "Shayk Anwar al Awlaki," "Shayk Abu Basir," and "Asrur al-Mujahideen".

According to open source reporting, Anwar al-Awlaki was an American-born Muslim scholar and cleric who was a recruiter and propagandist for al Qaeda in the Arabian Peninsula ("AQAP"). In or about 2009, al-Awlaki was promoted to a senior position within AQAP, and specifically was placed in charge of both AQAP's propaganda division as well as its so-called "external operations" division—the division responsible for the planning and execution of terrorist attacks outside of Yemen, including attacks against the United States and other Western countries. Al-Awlaki was killed in Yemen in September 2011.

---

[9] The explosives instructions were introduced as Government's Exhibit 4 at WASHINGTON's detention hearing. Case No. 2:19-cr-467 at Doc. 5.

According to open source reporting, Abu Basir (also known as Nasir al-Wuhayshi) was a Yemini citizen and the leader of AQAP. Basir was killed in Yemen in June 2015.

According to open source reporting, Asrur al-Mujahideen is an encryption software used by terrorist organizations to communicate without being intercepted by government agencies. The word "mujahideen" means those who are engaged in jihad, or fighters.

ATF also found the books "Principles of Improvised Explosives" and "How to Build Military Grade Suppressors"[10] inside a green 1993 Honda Civic that was parked on the premises.

The agents found eighteen electronic devices at the residence: two laptop computers, one Apple iPad, three flash drives, one digital audio recorder, one digital video recorder, and 10 cell phones, including the LG ZTE cell phone that Washington allowed ATF to examine on July 24, 2019.

The defendant arrived at his residence while the search was occurring. He was not detained or arrested. After concluding their work, law enforcement departed the defendant's residence.

---

[10] Images of the covers of these books were introduced as Government's Exhibits 5 and 6 at the defendant's detention hearing. Case No. 2:19-cr-467 at Doc. 5.

### Defendant Appears at ATF – July 29, 2019

On July 29, 2019, Washington went to the ATF office in Birmingham, Alabama, and requested to speak with the agents. During a non-custodial interview, the defendant reported, among other things, that he had sold numerous firearms in recent months, and that he had communicated with purchasers through cell phones and electronic applications that can be accessed through cell phones and computers. The defendant also stated that his admissions on July 24, 2019, were the "complete truth."

### Complaint, Arrest, and Related Search – August 6, 2019

On August 6, 2019, Chief United States Magistrate Judge John E. Ott signed a criminal complaint charging WASHINGTON with violating 18 U.S.C. § 922(a)(1)(A) (dealing in firearms without a license) and 922(a)(6) (false statement to a firearms dealer). ATF agents arrested WASHINGTON that same day, as he attempted to purchase another ATI Omni Hybrid Maxx, .300 blackout caliber, AR-style pistol (S/N NS208545) from Hoover Tactical Firearms. Following the arrest, WASHINGTON consented to a search of his vehicle, which contained:

- a Glock 19, 9mm caliber pistol (S/N BDMB989);

- an Apple iPhone (MEID 355825084326587); and

- an AT&T flip cell phone (IMEI 015411001646183).

The iPhone was one of the devices that WASHINGTON allowed the agents to search on July 24, 2019.

## ARGUMENT AND CITATION OF AUTHORITY

The defendant was not in custody during any of the interviews at his home or when he appeared at ATF unannounced. Nor was he in constructive custody. Therefore, the Court should find his statements admissible. All interviews occurred in the daytime; the Agents were not in uniform; never drew their weapons; never restrained the defendant; did not pat the defendant down and never told him where to sit or remain within his residence.

A person is entitled to advice of rights when he is in custody. *Miranda v. Arizona*, 384 U.S. 436 (1966). By contrast, someone who is not in custody is not entitled to Miranda warnings. *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006). The first step to determine whether a person is in custody for Miranda purposes "is to ascertain whether, in light of the objective circumstances of the interrogation" and the totality of all the circumstances, "a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (citations omitted). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is the reasonable innocent person. Whether a defendant knows he is guilty and believes that incriminating evidence will soon be discovered is irrelevant."

*United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) (citations omitted). "[T]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Yarborough v. Alvarado*, 541 U.S 652, 662 (2004).  An interviewee's "status as a suspect, and the 'coercive environment' that exists in virtually every interview by a police officer of a crime suspect," does not automatically create a custodial situation. *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) (quoting *United States v. Phillips*, 812 F.2d 1355, 1360-61 (11th Cir. 1987)). "[T]he ultimate inquiry, based on the circumstances of each case, is whether there is a restraint on the suspect's freedom of movement 'of the degree associated with a formal arrest.'" *Phillips*, 812 F.2d at 1359 (quoting *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984)).  If the interviewee is not in custody, he is not entitled to *Miranda* warnings, and any statements that he makes are admissible against him. *United States v. Luna-Encinas*, 603 F.3d 876, 882 (11th Cir. 2010).

Here, the totality of the circumstances show that the defendant was not in custody.  Significantly, the first three interviews began and/or occurred entirely within the defendant's residence.[11]  That setting supports the conclusion that the

_____

[11] As described above, the defendant voluntarily rode with Agents to other places after initial interviews at the 4th Court West residence on July 11 and 24.  In both instances, the defendant was not restrained in any way and was dropped at his residence at the conclusion of the trips.

defendant was not in custody because he was in a place that was comfortable and familiar.  *See United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006)("[I]t is significant that the interview took place in Diane's home, a place where Brown often resided.").

Further evidence of the absence of official coercion is the defendant's written consent to Agents search of his phone.  The defendant gave that consent "voluntarily without promises, threats, coercion or force of any kind whatsoever."  *See United States v. Qose*, — F. App'x —, No. 16-11098, 2017 WL 510429, at *2 (11th Cir. Feb. 8, 2017) (finding that one factor that the defendant was not in custody was that he "signed a consent form 'freely and voluntarily without fear of threats; coercion, or promises of any kind,' allowing the FBI to assume his online identity").

All interviews occurred in the daytime; the Agents were not in uniform; never drew their weapons; never restrained the defendant; did not pat the defendant down and never told him where to sit or remain within his residence.  Taken together, these factors demonstrate that the defendant was not in custody.

## **CONCLUSION**

The defendant's motion to suppress should be denied.

Respectfully submitted,

/s/ Henry Cornelius
Henry Cornelius
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

This pleading was filed on January 13, 2020 using the Court's ECF system, which will send copies to counsel of record.

/s/ Henry Cornelius
Henry Cornelius
Assistant United States Attorney